U.S. Department of Justice

Jeffrey A. Taylor
United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

April 14, 2008

<u>Via Fax and US Mail</u>

Billy L. Ponds, Esq.
The Ponds Law Firm
3218 O Street, N.W.
Suite 2
Washington, D.C. 20007

Re:    United States v. Marcia Anderson
       USAO# 2007R000966

Dear Mr. Ponds:

This letter sets forth the full and complete plea offer to your client, Marcia Anderson, from the Criminal Division of the United States Attorney's Office for the District of Columbia (hereinafter also referred to as "the Government" or "this Office"). **This plea offer will expire on April 14, 2008.** If your client accepts the terms and conditions of this offer, please have your client execute this document in the space provided below. Upon receipt of the executed document, this letter will become the Plea Agreement. The terms of the offer are as follows:

### <u>Charges and Statutory Penalties</u>

Your client agrees to plead guilty to a one count information charging her with a scheme to commit Wire Fraud in violation of 18 U.S.C. § 1343.

Your client understands that pursuant to 18 U.S.C. § 1343, the charge of Wire Fraud carries a maximum sentence of 20 years imprisonment and a fine of twice the pecuniary gain or loss pursuant to 18 U.S.C. § 3571(d), a $100 special assessment, a 5 year term of supervised release, an order of restitution, and an obligation to pay any applicable interest or penalties on fines or restitution not timely made.

In consideration of your client's plea to the above offense, your client will not be further prosecuted criminally by this Office for the conduct set forth in the attached Statement of Offense.

**Factual Stipulations**

Your client agrees that the attached "Statement of the Offense" fairly and accurately describes your client's actions and involvement in the offense to which your client is pleading guilty. It is anticipated that prior to or during the plea hearing, your client will adopt and sign the Statement of the Offense as a written proffer of evidence.

**Sentencing Guidelines Stipulations**

Your client understands that the sentence in this case will be determined by the Court, pursuant to the factors set forth in 18 U.S.C. § 3553(a), including a consideration of the guidelines and policies promulgated by the United States Sentencing Commission, Guidelines Manual (2007) (hereinafter "Sentencing Guidelines" or "U.S.S.G."). Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), and to assist the Court in determining the appropriate sentence, the parties stipulate to the following:

**A.    Offense Level under the Guidelines**

Sentencing Guidelines Stipulations

**Wire Fraud** (18 U.S.C. § 1343)

| | | |
|---|---|---|
| Base Offense Level | § 2B1.1 | 7 |
| Specific Offense Characteristics | | |
| Loss of More than $400,000 | § 2B1.1(b)(1) (H) | 14 |
| Abuse of Position of Trust | § 3B1.3 | 2 |
| TOTAL OFFENSE LEVEL | | 23 |

**Acceptance of Responsibility: 3-point reduction:** Provided that your client clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through your client's allocution and subsequent conduct prior to the imposition of sentence, the Government agrees that a 3-level reduction would be appropriate, pursuant to U.S.S.G § 3E1.1(a).

In accordance with the above, the applicable **Guidelines Offense Level is 20.**

**B.    Applicable Guideline Range**

Based upon the calculations set forth above, **your client's stipulated Sentencing Guidelines**

2

**range is 33-41 months in zone D ("Stipulated Guidelines Range").**

### Agreement as to Sentencing Allocution

The parties further agree that a sentence within the Stipulated Guidelines Range would constitute a reasonable sentence in light of all of the factors set forth in 18 U.S.C. § 3553(a). The Government agrees to not ask for a sentence outside of the Stipulated Guidelines Range.

Nothing in this Agreement limits the right of the parties to make any arguments regarding where within the Stipulated Guidelines Range (or such other range as the Court may determine) your client should be sentenced or to seek an appropriately adjusted sentencing range if it is determined based upon new information that your client's criminal history category is different from that set forth above. Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, *see* U.S.S.G. §3E1.1, and/or imposition of an adjustment for obstruction of justice, *see* U.S.S.G. §3C1.1, regardless of any stipulation set forth above, should your client move to withdraw your client's guilty plea after it is entered, or should it be determined that your client has either (i) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) engaged in additional criminal conduct after signing this Agreement.

### Court Not Bound by the Plea Agreement

It is understood that pursuant to Federal Rules of Criminal Procedure 11(c)(1)(B) and 11(c)(3)(B) the Court is not bound by the above stipulations, either as to questions of fact or as to the parties' determination of the applicable Guidelines range, or other sentencing issues. In the event that the Court considers any Guidelines adjustments, departures, or calculations different from any stipulations contained in this Agreement, or contemplates a sentence outside the Guidelines range based upon the general sentencing factors listed in Title 18, United States Code, Section 3553(a), the parties reserve the right to answer any related inquiries from the Court.

### Court Not Bound by the Non-Mandatory Sentencing Guidelines

It is understood that the sentence to be imposed upon your client is determined solely by the Court. It is understood that the Sentencing Guidelines are not binding on the Court. Your client acknowledges that your client's entry of a guilty plea to the charged offense authorizes the sentencing court to impose any sentence, up to and including the statutory maximum sentence, which may be greater than the applicable Guidelines range. The Government cannot, and does not, make any promise or representation as to what sentence your client will receive. Moreover, it is understood that your client will have no right to withdraw your client's plea of guilty should the Court impose a sentence outside the Guidelines range.

**Restitution**

In addition to the other penalties provided by law, the Court is mandated to order that your client make restitution in an amount determined by the Court under 18 U.S.C. § 3663A. Based on information the government has in its possession, restitution is $560,722.45 in this matter.

**Forfeiture**

Your client agrees to a money judgment of $560,722.45, which she agrees constitutes an amount of proceeds she derived from the wire fraud scheme. In addition, your client agrees not to contest the administrative, civil or criminal forfeiture of any and all assets, heretofore seized by the government ("Subject Properties"), including: $3,484.70 in U.S. currency; two Western Union money orders valued at $2,000.00; one Toshiba A205-S4587 laptop computer; one HP Pavillion dv600 laptop computer, $20,739.21 in funds seized from SunTrust account # xxxxxxxxx2124; $2,860.77 in funds seized from SunTrust account # xxxxxxxxx6195; a 2005 Nissan Pathfinder, VIN#: 5N1AR18W75C717814; and a 2003 BMW 525i, VIN#: WBADT33483GF43374 seized by law enforcement on or about October 10, 2007. Ms. Anderson also agrees to provide a sworn statement from her son, Owen George Anderson, Jr., in which he agrees not to contest the forfeiture or make a claim with respect to the 2005 Nissan Pathfinder, VIN#: 5N1AR18W75C717814. Ms. Anderson agrees that, notwithstanding how such asset may have been titled, she owns and exercises dominion and control over the 2005 Nissan Pathfinder.

In order to effectuate the forfeiture(s), your client agrees to the entry of a Consent Order of Forfeiture in the form of a money judgment, as well as to the forfeiture of the Subject Properties. The money judgment will be reduced by the value received by the government from the Subject Properties and forfeited as part of this Agreement as described in the Consent Order of Forfeiture.

Your client also agrees to identify all assets over which your client exercises control, directly or indirectly, (or has exercised such control, within the past five years), and all assets in which your client has or had during that time any financial interest. Your client agrees to take all steps as requested by the Government to obtain from any other parties by any lawful means any records of assets owned at any time by your client. Your client agrees to undergo any polygraph examination the Government may choose to administer concerning such assets and to provide and/or consent to the release of your client's tax returns for the previous five years. Your client agrees to forfeit to the United States all of your client's interests in any asset of a value of more than $1000 that, within the last five years, your client owned, or in which your client maintained an interest, the ownership of which your client fails to disclose to the Government in accordance with this Plea Agreement.

Your client agrees to consent to the entry of orders of forfeiture for the money judgment and assets identified above and waives the requirements of Federal Rules of Criminal Procedure

4

32.2 regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Your client acknowledges that your client understands that the forfeiture of assets is part of the sentence that may be imposed in this case and your client waives any failure by the Court to advise your client of this, pursuant to Rule 11(b)(1)(J), at the time your client's guilty plea is accepted.

Your client further agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. Your client agrees to take all steps as requested by the Government to pass clear title to forfeitable assets to the United States, and to testify truthfully in any judicial forfeiture proceeding. Your client acknowledges that all property covered by this Plea Agreement is subject to forfeiture as proceeds of illegal conduct, property involved in illegal conduct giving rise to forfeiture; and/or substitute assets for property otherwise subject to forfeiture.

From the forfeited assets, the government intends to provide the victim(s) with restitution. The government agrees that it will not oppose any request by the defendant that the restitution ordered by the Court as part of a sentence be offset by the value of the assets turned over to the victim(s), by the government, through the administrative, civil or criminal forfeiture process.

**Release/Detention**

Your client acknowledges that while the Government will not seek a change in your client's release conditions pending sentencing, the final decision regarding your client's bond status or detention will be made by the Court at the time of your client's plea of guilty. Should your client engage in further criminal conduct prior to sentencing, however, the Government may move to change your client's conditions of release.

**Breach of Agreement**

Your client understands and agrees that if, after entering this Plea Agreement, your client fails specifically to perform or to fulfill completely each and every one of your client's obligations under this Plea Agreement, or engages in any criminal activity prior to sentencing, your client will have breached this Plea Agreement. In the event of such a breach: (a) the Government will be free from its obligations under the Agreement; (b) your client will not have the right to withdraw the guilty plea; (c) your client shall be fully subject to criminal prosecution for any other crimes, including perjury and obstruction of justice; and (d) the Government will be free to use against your client, directly and indirectly, in any criminal or civil proceeding, all statements made by your client and any of the information or materials provided by your client, including such statements, information and materials provided pursuant to this Agreement or during the course of any debriefings conducted in anticipation of, or after entry of this

Agreement, including your client's statements made during proceedings before the Court pursuant to Fed. R. Crim. P. 11.

Your client acknowledges discussing with you Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410, rules which ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn. Your client knowingly and voluntarily waives the rights which arise under these rules.

Your client understands and agrees that the Government shall only be required to prove a breach of this Plea Agreement by a preponderance of the evidence. Your client further understands and agrees that the Government need only prove a violation of federal, state, or local criminal law by probable cause in order to establish a breach of this Plea Agreement.

Nothing in this Agreement shall be construed to permit your client to commit perjury, to make false statements or declarations, to obstruct justice, or to protect your client from prosecution for any crimes not included within this Agreement or committed by your client after the execution of this Agreement. Your client understands and agrees that the Government reserves the right to prosecute your client for any such offenses. Your client further understands that any perjury, false statements or declarations, or obstruction of justice relating to your client's obligations under this Agreement shall constitute a breach of this Agreement. However, in the event of such a breach, your client will not be allowed to withdraw this guilty plea.

## Waiver of Statute of Limitations

It is further agreed that should the conviction following your client's plea of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement (including any counts that the Government has agreed not to prosecute or to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against your client, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

## Waiver of Right to DNA Testing

By entering this plea of guilty, your client waives any and all right your client may have, pursuant to 18 U.S.C. § 3600, to require DNA testing of any physical evidence in the possession of the Government. Your client fully understands that, as a result of this waiver, any physical evidence in this case will not be preserved by the Government and will therefore not be available for DNA testing in the future.

**Complete Agreement**

No other agreements, promises, understandings, or representations have been made by the parties or their counsel than those contained in writing herein, nor will any such agreements, promises, understandings, or representations be made unless committed to writing and signed by your client, defense counsel, and an Assistant United States Attorney for the District of Columbia.

Your client further understands that this Agreement is binding only upon the Criminal Division of the United States Attorney's Office for the District of Columbia. This Agreement does not bind the Civil Division of this Office or any other United States Attorney's Office, nor does it bind any other state, local, or federal prosecutor. It also does not bar or compromise any civil, tax, or administrative claim pending or that may be made against your client.

If the foregoing terms and conditions are satisfactory, your client may so indicate by signing the Agreement in the space indicated below and returning the original to me once it has been signed by your client and by you or other defense counsel.

Sincerely yours,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

By:

ANTHONY M. ALEXIS
JOCELYN BALLANTINE
Assistant United States Attorneys
FEDERAL MAJOR CRIMES SECTION

7

## DEFENDANT'S ACCEPTANCE

I have read this Plea Agreement and have discussed it with my attorney, Billy Ponds, Esquire. I fully understand this Agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Agreement fully. I am pleading guilty because I am in fact guilty of the offense identified in this Agreement.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Plea Agreement. I am satisfied with the legal services provided by my attorney in connection with this Plea Agreement and matters related to it.

Date: 4/14/08

MARCIA ANDERSON
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read each of the pages constituting this Plea Agreement, reviewed them with my client, and discussed the provisions of the Agreement with my client, fully. These pages accurately and completely set forth the entire Plea Agreement. I concur in my client's desire to plead guilty as set forth in this Agreement.

Date: 4-14-08

BILLY PONDS, Esquire
Attorney for the Defendant

8

TOTAL P.09

## DEFENDANT'S ACCEPTANCE

I have read this Plea Agreement and have discussed it with my attorney, Billy Ponds, Esquire. I fully understand this Agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Agreement fully. I am pleading guilty because I am in fact guilty of the offense identified in this Agreement.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Plea Agreement. I am satisfied with the legal services provided by my attorney in connection with this Plea Agreement and matters related to it.

Date: _____        _____
                                     MARCIA ANDERSON
                                     Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read each of the pages constituting this Plea Agreement, reviewed them with my client, and discussed the provisions of the Agreement with my client, fully. These pages accurately and completely set forth the entire Plea Agreement. I concur in my client's desire to plead guilty as set forth in this Agreement.

Date: _____        _____
                                     BILLY PONDS, Esquire
                                     Attorney for the Defendant

8

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | |
| MARCIA ANDERSON, | : | |
| | : | **VIOLATION: 18 U.S.C. § 1343** |
| Defendant. | : | **(Wire Fraud)** |

<u>STATEMENT OF THE OFFENSE</u>

The United States, by and through its attorney, the United States Attorney for the District of Columbia, and Defendant, Marcia Anderson (ANDERSON), hereby submit this Statement of the Offense.

<u>INTRODUCTION</u>

As set forth herein, ANDERSON utilizing her position as a manager at WMATA from in or about 2001 through 2007 created a scheme to steal funds belonging to WMATA that had been entrusted into her care, custody and control before being forwarded to WMATA's treasury office. As also set forth herein, ANDERSON used the interstate wires between the District of Columbia and the Commonwealth of Virginia to execute her scheme.

<u>WMATA AND ITS SALES OFFICES</u>

At all times relevant to this Statement of Offense: Washington Metropolitan Area Transit Authority (WMATA) was an organization or agency that was created to operate the regional transportation system in the National Capitol area. WMATA provided rail and bus service to a population of over three million people and had a transit zone which covers the District of Columbia, suburban Maryland, and Northern Virginia. For at least the last 10 years, WMATA's headquarters has been located at 600 Fifth Street N.W., in the District of Columbia. WMATA had received

millions of dollars of Federal funds and was in an industry that effects interstate commerce between the State of Maryland, the Commonwealth of Virginia, and the District of Columbia. At all times relevant to this Statement of Offense, WMATA maintained a treasury office in Alexandria, Virginia.

From at least 2001 until her separation from WMATA in October of 2007, ANDERSON held the title of "Supervisor of Transit Sales Clerks," and oversaw the activities of ten to fifteen transit sales clerks who worked at three sales windows in Washington, D.C, specifically located at: 4615 Fourteenth Street, N.W.; 17 M Street, S.E., and underneath 607 Thirteenth Street, N.W. (Metro Center subway station).   As the Supervisor of Transit Sales Clerks, ANDERSON earned approximately $48,000 per year at WMATA. As a supervisor in the WMATA Transit Sales Office ANDERSON was responsible for the collection and accounting for cash that was generated from transportation media sales at three WMATA sales offices in the District of Columbia.

From at least 2001 until October 2007, WMATA maintained sales offices in the District of Columbia in order to sell "Metro Fare Media" to the commuting public. Metro Fare Media refers to bus tokens, student passes, senior citizen passes, and Metro Fare Cards. Each sales office was operated by a transit sales clerk who engaged in individual sales transactions with customers at a walk-up window.

The Metro Fare Media sold by transit sales clerks included one day passes, D.C. public school bus tokens, weekly student passes, and adult bus tokens. A transit sales clerk could accept either cash or "Metrocheks" for payment of the Metro Fare Media.

A "Metrochek" is an electronic coded card that was available in denominations of $1, $5, $10, $20 and $30. Significantly, a Metrochek was an exchangeable voucher that was accepted as payment by Metro for all Metro Fare Media. When a customer made a purchase of Metro Fare

2

Media (for example a bus token), in lieu of cash, the customer could pay for the Metro Fare Media with a Metrochek.  On those occasions when a customer paid with a Metrochek, he did not get any change in cash; instead, the customer was given Metrocheks in the denomination and amount of change he was owed by the transit sales clerk.  (For example if the customer was owed three dollars, instead of cash, he was given three, one dollar Metrocheks.)  The transit sales clerk cancelled the Metrochek that he received from the customer by stapling it to the transaction receipt and then placed the cancelled Metrochek into his cashier drawer.  Other than the staple holes in a cancelled Metrochek, there was nothing that distinguished a Metrochek that had been used in this manner from any other Metrochek.  The cancelled Metrocheks were sent to WMATA treasury where they were supposed to be destroyed.

Each transaction was recorded by the transit sales clerk's cash register through a computer program called the WMATA POS (point of sale program).  At the end of the transit sales clerk's shift, he generated a hand-written and computer generated report known as an "end-of-day balance sheet" (also known as a "cashiers balance report") and took it to his supervisor - such as ANDERSON.  This three page report had a detailed accounting of what Metro Fare Media the transit sales clerk sold during his shift, how much cash the transit sales clerk had in the cashier drawer, and how much remaining Metro Fare Media the transit sales clerk had in his cashier drawer, including cancelled Metrocheks.

Daily, the transit sales clerk and the supervisor reviewed the end-of-day balance sheet with each other, and the transit sales clerk signed the end-of-day balance sheet in the supervisor's presence before he left the premises.

3

The supervisor finalized the report and daily faxed a copy of the report from Washington, D.C. to WMATA's treasury office located in Alexandria, Virginia where it was used to verify the sales and cash that had been sent via WMATA carrier to the WMATA treasury office each day. In addition to having faxed paper copies of the reports to WMATA's treasury office, no less than twice per week the supervisor sent via the WMATA computer internet system an electronic journal from Washington, D.C. to the WMATA treasury in Alexandria, Virginia.

<u>MARCIA ANDERSON</u>

ANDERSON was the salaried supervisor of Transit Sales at WMATA from approximately 2001 until she separated from WMATA on or about October 10, 2007. According to WMATA records, from 2001 through 2007, ANDERSON was paid a salary ranging from approximately $42,000.00 to $49,747.00. ANDERSON routinely received her payments from WMATA via direct deposit into an account she owned and controlled at SunTrust bank. As supervisor, ANDERSON had the duties and responsibilities as previously noted.

<u>THE SCHEME TO STEAL USING THE WIRES</u>

Beginning in 2001 and continuing until October 10, 2007, ANDERSON, devised and executed a scheme to steal in excess of $550,000 from WMATA in which she took cash from transit sales clerks' cashier drawers and replaced the stolen cash with cancelled Metrocheks. Routinely ANDERSON stole amounts up to two thousand dollars in cash from the transit sales clerks' cashier drawer, and substituted up to two thousand dollars worth of cancelled Metrocheks into the drawer before she transmitted the contents of cash and Metrocheks to the treasury. At the same time ANDERSON physically took the cash and substituted Metrocheks in a transit sales clerk's cashier drawer, she made false journal entries into the accounting system. ANDERSON then prepared

4

end-of-day balance sheets that she presented to the transit sales clerk as part of the end of shift reconciliation process. At that time, ANDERSON obtained the signature of the transit sales clerk and cleared him or her for departure.

After the transit sales clerk left the premises, ANDERSON logged onto the computer either using the transit sales clerk's password, or by not logging the transit sales clerk completely out of the system and "re-balanced" the amount of cash collected by the transit sales clerk by decreasing the cash in the amount that she had stolen from the cash column on the cashier balance report and inflating the number of Metrocheks the transit sales clerk had accepted for the day. ANDERSON then printed out the end-of-day balance sheet, forged the transit sales clerk's signature on the report and then sent the report via fax to the WMATA treasury office in Alexandria, Virginia from one of three District of Columbia locations. ANDERSON knew or should have known that the officials at WMATA relied upon the reports in order to audit or verify the amount of funds that had been collected at the sales offices.

On one or more occasions a sales clerk observed ANDERSON in possession of a plastic bag containing cancelled Metrocheks. The sales clerk began to xerox her end-of-day balance sheet before she left the premises. In or about May of 2007, the sales clerk returned to the office after she had signed out and had been given an end-of-day balance sheet (that she had already signed) and observed that ANDERSON had logged back onto the system and was changing the sales clerk's sales figures in the computer.

A second sales clerk observed on or about June 27, 2007, that ANDERSON had forged the sales clerk's name on her end-of-day balance sheet. The second sales clerk also observed that an end-of-day balance sheet for her drawer from the previous day had been left on top of one of the

computer monitors near the sales window. The sales clerk inspected the document dated on or about June 26, 2007 and noticed three things: (a) the cash that the second sales clerk had collected the day before had been significantly reduced on the balance sheet; (b) the number of Metrocheks that the second sales clerk had collected had been grossly inflated on the balance sheet from what she had collected; and, (c) the second sales clerk's signature on the end-of-day balance sheet had been forged. The second sales clerk also began to keep xeroxed copies of her end-of-day balance reports.

E-Corp was the contractor hired by WMATA to manage the point of sale computer program and system in which the sales clerk noted their sales and also in which ANDERSON verified the sales clerk's sales totals. Upon closing the report, in addition to faxing a copy of the report to the WMATA treasury office, ANDERSON was to transmit an electronic journal of the reports to the WMATA treasury office in Alexandria, Virginia. E-Corp also has had the ability to review the computer system and note changes of sales figures that had been made by either a sales clerk or by the Sales Supervisor. A representative of E-Corp audited ANDERSON's computer activities with respect to the records of Metro Fare media sales and the amount of cash received at sales offices under her supervision. From May of 2006 to October 9, 2007 E-Corp detailed that ANDERSON routinely logged onto the WMATA computer system after the transit sales clerks ended their shifts and departed WMATA premises and made journal entries that: (a) falsely inflated the number of Metrocheks that had been received by the transit sales clerks, and (b) decreased the amount of cash the transit sales clerks had received. During this period of May 2006 through October 9, 2007, alone, computer records reflected that ANDERSON transferred $60,000 out of the "cash" column in the last eighteen months at the 4615 Fourteenth Street, N.W. sales office alone.

6

A review of the documents that have been obtained from WMATA, including documents recovered from ANDERSON's trash can at WMATA, when compared side by side to the computer logs revealed that ANDERSON (a) reduced the amount of cash obtained by WMATA sales clerks by increasing other fare media in the accounting paperwork; (b) logged into the computer accounting records and falsely decreasing the amount of cash that WMATA received from its sales offices; and, (c) forged the names of WMATA sales clerks on the various accounting records submitted to WMATA to falsely reflect the amount of cash received by the sales clerks including the following dates and amounts.

On or about May 11, 2007, computer records of WMATA and the cash reports submitted by the cashiers reveal that ANDERSON removed $2,274 in cash from WMATA and decreased the amount of cash collected at the sales office in accounting records submitted to WMATA's treasury office in Alexandria, Virginia via fax.

On or about May 12, 2007, computer records of WMATA and the cash reports submitted by the cashiers reveal that ANDERSON removed $500 in cash from WMATA and decreased the amount of cash collected at the sales office in accounting records submitted to WMATA's treasury office in Alexandria, Virginia via fax.

On or about May 18, 2007, computer records of WMATA and the cash reports submitted by the cashiers reveal that ANDERSON removed $2096.25 in cash from WMATA and decreased the amount of cash collected at the sales office in accounting records submitted to WMATA's treasury office in Alexandria, Virginia via fax.

On or about May 25, 2007, computer records of WMATA and the cash reports submitted by the cashiers reveal that ANDERSON removed $2,368 in cash from WMATA and decreased the

amount of cash collected at the sales office in accounting records submitted to WMATA's treasury office in Alexandria, Virginia via fax.

On or about May 29, 2007, computer records of WMATA and the cash reports submitted by the cashiers reveal that ANDERSON removed $1,786 in cash from WMATA and decreased the amount of cash collected at the sales office in accounting records submitted to WMATA's treasury office in Alexandria, Virginia via fax.

For a four day period towards the end of September for example, starting on or about September 19, 2007, computer records of WMATA and the cash reports submitted by cashiers revealed that ANDERSON removed $150.00 in cash from WMATA and decreased the amount of cash collected at the sales office in accounting records submitted to WMATA.  On or about that same day, ANDERSON knowingly and intentionally faxed a false and misleading sales report to WMATA treasury to hide the true amount of cash which WMATA had received.

On or about September 20, 2007, computer records of WMATA and the cash reports submitted by cashiers revealed that ANDERSON removed $210.00 in cash from WMATA and decreased the amount of cash collected at the sales office in accounting records submitted to WMATA's treasury office in Alexandria, Virginia via fax.

On or about September 21, 2007, computer records of WMATA and the cash reports submitted by cashiers reveal that ANDERSON removed $400.00 in cash from WMATA and decreased the amount of cash collected at the sales office in accounting records submitted to WMATA's treasury office in Alexandria, Virginia via fax.

On or about September 24, 2007, computer records of WMATA and the cash reports submitted by cashiers reveal that ANDERSON removed $2,147.50 in cash from WMATA and

8

decreased the amount of cash collected at the sales office in accounting records submitted to WMATA's treasury office in Alexandria, Virginia via fax.

That is, for a four day period of WMATA sales, documents reflect that ANDERSON stole $2,907.50 in cash from WMATA and prepared false accounting reports which she submitted to WMATA's treasury by electronic communications between the District of Columbia and Alexandria, Virginia.

As further evidence of the thefts and evidence of the utilization of the money stolen from WMATA by ANDERSON, from 2003 until October 9, 2007 on a continuous and routine basis, ANDERSON made large deposits into bank accounts that she owns or otherwise controls. Specifically, from December of 2003 through August 2007, ANDERSON made large deposits of at least $400,000 into accounts she owns over and above the direct deposit of her salary from WMATA. Many of these deposits were mixed deposits comprised of cash, checks, and or money orders. ANDERSON routinely deposited checks and money orders which were made out to ANDERSON and others friends and relatives whose names she routinely would forge on the checks and money orders in order to make the deposits of the proceeds of her WMATA thefts.

ANDERSON engaged in multiple financial transactions in order to disguise the nature and source of her funds before she placed them into various accounts for her personal use. ANDERSON utilized six accounts at Sun Trust Bank, two accounts at PNC Bank, two accounts at Wachovia Bank and one account at Hoya Credit Union.

ANDERSON received approximately $2,500.00 in direct deposit funds from WMATA per month into the SunTrust Bank account ending in number 6195 from December 2003 through October 10, 2007. In addition to the approximately $2,500.00 per month in direct deposits,

ANDERSON made monthly deposits which averaged approximately $6,000 per month in 2004, $8,000.00 per month in 2005, $12,000.00 per month in 2006 and about $12,000 per month for the first six months of 2007. ANDERSON routinely deposited large amounts of money unrelated to her WMATA payroll into Sun Trust accounts. In the SunTrust accounts alone ANDERSON has deposited over $350,000 into the accounts for the period of December 2003, through October 2007.

Further ANDERSON utilized the Sun Trust account which contained these deposits to make purchases including a parcel of real property in the District of Columbia located at 1838 "M" Street, N.E., a parcel of property in the State of Maryland located at 3505 Olive Branch Drive in Silver Spring, Maryland, and a Nissan Pathfinder automobile and BMW automobiles which were registered and housed in Montgomery County, Maryland. Further ANDERSON paid credit card balances for credit cards which she made personal expenditures such as personal trips and consumer goods such as computers and home furnishings, including three computers from Circuit City on or about April 27, 2007 and April 29, 2007.

In 2006, while the wire fraud scheme was being executed by ANDERSON, she purchased a $37,000 BMW which she paid for by depositing approximately $11,000 (by way of a trade-in allowance) and then paid off the remainder of the loan within one year, including a $1,500 monthly payment and payments totaling $9,960.51 which she made between July 24, 2006 and July 25, 2006 to BMW Credit Corporation.

On or about October 10, 2007, law enforcement officials from the United States government and WMATA executed a search warrant at the residence of ANDERSON. At that time, officials recovered 210 Metro fare cards, $3,484.70 in US currency (with the bills placed in a bundle and coins in a sack), two Western Union Money Orders in the amount of $1,000 each, a bundled pack

of Metrocheks with a piece of paper containing a notation "2029" on it (the approximate amount of

funds which had been removed from the WMATA sales office the week before the search warrant

had been executed.

    As a result of ANDERSON's scheme she caused the loss of $560,722.45 of money belonging

to WMATA .

JEFFREY A. TAYLOR
United States Attorney

By:        _____

ANTHONY M. ALEXIS
Assistant United States Attorney
D.C. Bar # 384545
United States Attorneys Office
Federal Major Crimes Section
555 4th Street, N.W.
Washington, D.C.  20530
(202) 514-9416
Anthony.m.alexis@usdoj.gov

11

## DEFENDANT'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have discussed it with my attorney, Billy Ponds, Esquire. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 4/14/08

Marcia Anderson
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 4-14-08

Billy Ponds, Esquire
Attorney for Defendant

12

## DEFENDANT'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have discussed it with my attorney, Billy Ponds, Esquire. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.


Date:_____          _____
                                  Marcia Anderson
                                  Defendant


## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.


Date: _____          _____
                                   Billy Ponds, Esquire
                                   Attorney for Defendant


12