UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | |
| MARCIA ANDERSON, : | |
| : | VIOLATION: 18 U.S.C. § 1343 |
| Defendant. : | (Wire Fraud) |

STATEMENT OF THE OFFENSE

The United States, by and through its attorney, the United States Attorney for the District of Columbia, and Defendant, Marcia Anderson (ANDERSON), hereby submit this Statement of the Offense.

INTRODUCTION

As set forth herein, ANDERSON utilizing her position as a manager at WMATA from in or about 2001 through 2007 created a scheme to steal funds belonging to WMATA that had been entrusted into her care, custody and control before being forwarded to WMATA's treasury office. As also set forth herein, ANDERSON used the interstate wires between the District of Columbia and the Commonwealth of Virginia to execute her scheme.

WMATA AND ITS SALES OFFICES

At all times relevant to this Statement of Offense: Washington Metropolitan Area Transit Authority (WMATA) was an organization or agency that was created to operate the regional transportation system in the National Capitol area. WMATA provided rail and bus service to a population of over three million people and had a transit zone which covers the District of Columbia, suburban Maryland, and Northern Virginia. For at least the last 10 years, WMATA's headquarters has been located at 600 Fifth Street N.W., in the District of Columbia. WMATA had received

millions of dollars of Federal funds and was in an industry that effects interstate commerce between the State of Maryland, the Commonwealth of Virginia, and the District of Columbia. At all times relevant to this Statement of Offense, WMATA maintained a treasury office in Alexandria, Virginia.

From at least 2001 until her separation from WMATA in October of 2007, ANDERSON held the title of "Supervisor of Transit Sales Clerks," and oversaw the activities of ten to fifteen transit sales clerks who worked at three sales windows in Washington, D.C, specifically located at: 4615 Fourteenth Street, N.W.; 17 M Street, S.E., and underneath 607 Thirteenth Street, N.W. (Metro Center subway station). As the Supervisor of Transit Sales Clerks, ANDERSON earned approximately $48,000 per year at WMATA. As a supervisor in the WMATA Transit Sales Office ANDERSON was responsible for the collection and accounting for cash that was generated from transportation media sales at three WMATA sales offices in the District of Columbia.

From at least 2001 until October 2007, WMATA maintained sales offices in the District of Columbia in order to sell "Metro Fare Media" to the commuting public. Metro Fare Media refers to bus tokens, student passes, senior citizen passes, and Metro Fare Cards. Each sales office was operated by a transit sales clerk who engaged in individual sales transactions with customers at a walk-up window.

The Metro Fare Media sold by transit sales clerks included one day passes, D.C. public school bus tokens, weekly student passes, and adult bus tokens. A transit sales clerk could accept either cash or "Metrocheks" for payment of the Metro Fare Media.

A "Metrochek" is an electronic coded card that was available in denominations of $1, $5, $10, $20 and $30. Significantly, a Metrochek was an exchangeable voucher that was accepted as payment by Metro for all Metro Fare Media. When a customer made a purchase of Metro Fare

Media (for example a bus token), in lieu of cash, the customer could pay for the Metro Fare Media with a Metrochek. On those occasions when a customer paid with a Metrochek, he did not get any change in cash; instead, the customer was given Metrocheks in the denomination and amount of change he was owed by the transit sales clerk. (For example if the customer was owed three dollars, instead of cash, he was given three, one dollar Metrocheks.) The transit sales clerk cancelled the Metrochek that he received from the customer by stapling it to the transaction receipt and then placed the cancelled Metrochek into his cashier drawer. Other than the staple holes in a cancelled Metrochek, there was nothing that distinguished a Metrochek that had been used in this manner from any other Metrochek. The cancelled Metrocheks were sent to WMATA treasury where they were supposed to be destroyed.

Each transaction was recorded by the transit sales clerk's cash register through a computer program called the WMATA POS (point of sale program). At the end of the transit sales clerk's shift, he generated a hand-written and computer generated report known as an "end-of-day balance sheet" (also known as a "cashiers balance report") and took it to his supervisor - such as ANDERSON. This three page report had a detailed accounting of what Metro Fare Media the transit sales clerk sold during his shift, how much cash the transit sales clerk had in the cashier drawer, and how much remaining Metro Fare Media the transit sales clerk had in his cashier drawer, including cancelled Metrocheks.

Daily, the transit sales clerk and the supervisor reviewed the end-of-day balance sheet with each other, and the transit sales clerk signed the end-of-day balance sheet in the supervisor's presence before he left the premises.

The supervisor finalized the report and daily faxed a copy of the report from Washington, D.C. to WMATA's treasury office located in Alexandria, Virginia where it was used to verify the sales and cash that had been sent via WMATA carrier to the WMATA treasury office each day. In addition to having faxed paper copies of the reports to WMATA's treasury office, no less than twice per week the supervisor sent via the WMATA computer internet system an electronic journal from Washington, D.C. to the WMATA treasury in Alexandria, Virginia.

### MARCIA ANDERSON

ANDERSON was the salaried supervisor of Transit Sales at WMATA from approximately 2001 until she separated from WMATA on or about October 10, 2007. According to WMATA records, from 2001 through 2007, ANDERSON was paid a salary ranging from approximately $42,000.00 to $49,747.00. ANDERSON routinely received her payments from WMATA via direct deposit into an account she owned and controlled at SunTrust bank. As supervisor, ANDERSON had the duties and responsibilities as previously noted.

### THE SCHEME TO STEAL USING THE WIRES

Beginning in 2001 and continuing until October 10, 2007, ANDERSON, devised and executed a scheme to steal in excess of $550,000 from WMATA in which she took cash from transit sales clerks' cashier drawers and replaced the stolen cash with cancelled Metrocheks. Routinely ANDERSON stole amounts up to two thousand dollars in cash from the transit sales clerks' cashier drawer, and substituted up to two thousand dollars worth of cancelled Metrocheks into the drawer before she transmitted the contents of cash and Metrocheks to the treasury. At the same time ANDERSON physically took the cash and substituted Metrocheks in a transit sales clerk's cashier drawer, she made false journal entries into the accounting system. ANDERSON then prepared

end-of-day balance sheets that she presented to the transit sales clerk as part of the end of shift reconciliation process. At that time, ANDERSON obtained the signature of the transit sales clerk and cleared him or her for departure.

After the transit sales clerk left the premises, ANDERSON logged onto the computer either using the transit sales clerk's password, or by not logging the transit sales clerk completely out of the system and "re-balanced" the amount of cash collected by the transit sales clerk by decreasing the cash in the amount that she had stolen from the cash column on the cashier balance report and inflating the number of Metrocheks the transit sales clerk had accepted for the day. ANDERSON then printed out the end-of-day balance sheet, forged the transit sales clerk's signature on the report and then sent the report via fax to the WMATA treasury office in Alexandria, Virginia from one of three District of Columbia locations. ANDERSON knew or should have known that the officials at WMATA relied upon the reports in order to audit or verify the amount of funds that had been collected at the sales offices.

On one or more occasions a sales clerk observed ANDERSON in possession of a plastic bag containing cancelled Metrocheks. The sales clerk began to xerox her end-of-day balance sheet before she left the premises. In or about May of 2007, the sales clerk returned to the office after she had signed out and had been given an end-of-day balance sheet (that she had already signed) and observed that ANDERSON had logged back onto the system and was changing the sales clerk's sales figures in the computer.

A second sales clerk observed on or about June 27, 2007, that ANDERSON had forged the sales clerk's name on her end-of-day balance sheet. The second sales clerk also observed that an end-of-day balance sheet for her drawer from the previous day had been left on top of one of the

5

computer monitors near the sales window. The sales clerk inspected the document dated on or about June 26, 2007 and noticed three things: (a) the cash that the second sales clerk had collected the day before had been significantly reduced on the balance sheet; (b) the number of Metrocheks that the second sales clerk had collected had been grossly inflated on the balance sheet from what she had collected; and, (c) the second sales clerk's signature on the end-of-day balance sheet had been forged. The second sales clerk also began to keep xeroxed copies of her end-of-day balance reports.

E-Corp was the contractor hired by WMATA to manage the point of sale computer program and system in which the sales clerk noted their sales and also in which ANDERSON verified the sales clerk's sales totals. Upon closing the report, in addition to faxing a copy of the report to the WMATA treasury office, ANDERSON was to transmit an electronic journal of the reports to the WMATA treasury office in Alexandria, Virginia. E-Corp also has had the ability to review the computer system and note changes of sales figures that had been made by either a sales clerk or by the Sales Supervisor. A representative of E-Corp audited ANDERSON's computer activities with respect to the records of Metro Fare media sales and the amount of cash received at sales offices under her supervision. From May of 2006 to October 9, 2007 E-Corp detailed that ANDERSON routinely logged onto the WMATA computer system after the transit sales clerks ended their shifts and departed WMATA premises and made journal entries that: (a) falsely inflated the number of Metrocheks that had been received by the transit sales clerks, and (b) decreased the amount of cash the transit sales clerks had received. During this period of May 2006 through October 9, 2007, alone, computer records reflected that ANDERSON transferred $60,000 out of the "cash" column in the last eighteen months at the 4615 Fourteenth Street, N.W. sales office alone.

A review of the documents that have been obtained from WMATA, including documents recovered from ANDERSON's trash can at WMATA, when compared side by side to the computer logs revealed that ANDERSON (a) reduced the amount of cash obtained by WMATA sales clerks by increasing other fare media in the accounting paperwork; (b) logged into the computer accounting records and falsely decreasing the amount of cash that WMATA received from its sales offices; and, (c) forged the names of WMATA sales clerks on the various accounting records submitted to WMATA to falsely reflect the amount of cash received by the sales clerks including the following dates and amounts.

On or about May 11, 2007, computer records of WMATA and the cash reports submitted by the cashiers reveal that ANDERSON removed $2,274 in cash from WMATA and decreased the amount of cash collected at the sales office in accounting records submitted to WMATA's treasury office in Alexandria, Virginia via fax.

On or about May 12, 2007, computer records of WMATA and the cash reports submitted by the cashiers reveal that ANDERSON removed $500 in cash from WMATA and decreased the amount of cash collected at the sales office in accounting records submitted to WMATA's treasury office in Alexandria, Virginia via fax.

On or about May 18, 2007, computer records of WMATA and the cash reports submitted by the cashiers reveal that ANDERSON removed $2096.25 in cash from WMATA and decreased the amount of cash collected at the sales office in accounting records submitted to WMATA's treasury office in Alexandria, Virginia via fax.

On or about May 25, 2007, computer records of WMATA and the cash reports submitted by the cashiers reveal that ANDERSON removed $2,368 in cash from WMATA and decreased the

amount of cash collected at the sales office in accounting records submitted to WMATA's treasury office in Alexandria, Virginia via fax.

On or about May 29, 2007, computer records of WMATA and the cash reports submitted by the cashiers reveal that ANDERSON removed $1,786 in cash from WMATA and decreased the amount of cash collected at the sales office in accounting records submitted to WMATA's treasury office in Alexandria, Virginia via fax.

For a four day period towards the end of September for example, starting on or about September 19, 2007, computer records of WMATA and the cash reports submitted by cashiers revealed that ANDERSON removed $150.00 in cash from WMATA and decreased the amount of cash collected at the sales office in accounting records submitted to WMATA. On or about that same day, ANDERSON knowingly and intentionally faxed a false and misleading sales report to WMATA treasury to hide the true amount of cash which WMATA had received.

On or about September 20, 2007, computer records of WMATA and the cash reports submitted by cashiers revealed that ANDERSON removed $210.00 in cash from WMATA and decreased the amount of cash collected at the sales office in accounting records submitted to WMATA's treasury office in Alexandria, Virginia via fax.

On or about September 21, 2007, computer records of WMATA and the cash reports submitted by cashiers reveal that ANDERSON removed $400.00 in cash from WMATA and decreased the amount of cash collected at the sales office in accounting records submitted to WMATA's treasury office in Alexandria, Virginia via fax.

On or about September 24, 2007, computer records of WMATA and the cash reports submitted by cashiers reveal that ANDERSON removed $2,147.50 in cash from WMATA and

decreased the amount of cash collected at the sales office in accounting records submitted to WMATA's treasury office in Alexandria, Virginia via fax.

That is, for a four day period of WMATA sales, documents reflect that ANDERSON stole $2,907.50 in cash from WMATA and prepared false accounting reports which she submitted to WMATA's treasury by electronic communications between the District of Columbia and Alexandria, Virginia.

As further evidence of the thefts and evidence of the utilization of the money stolen from WMATA by ANDERSON, from 2003 until October 9, 2007 on a continuous and routine basis, ANDERSON made large deposits into bank accounts that she owns or otherwise controls. Specifically, from December of 2003 through August 2007, ANDERSON made large deposits of at least $400,000 into accounts she owns over and above the direct deposit of her salary from WMATA. Many of these deposits were mixed deposits comprised of cash, checks, and or money orders. ANDERSON routinely deposited checks and money orders which were made out to ANDERSON and others friends and relatives whose names she routinely would forge on the checks and money orders in order to make the deposits of the proceeds of her WMATA thefts.

ANDERSON engaged in multiple financial transactions in order to disguise the nature and source of her funds before she placed them into various accounts for her personal use. ANDERSON utilized six accounts at Sun Trust Bank, two accounts at PNC Bank, two accounts at Wachovia Bank and one account at Hoya Credit Union.

ANDERSON received approximately $2,500.00 in direct deposit funds from WMATA per month into the SunTrust Bank account ending in number 6195 from December 2003 through October 10, 2007. In addition to the approximately $2,500.00 per month in direct deposits,

ANDERSON made monthly deposits which averaged approximately $6,000 per month in 2004, $8,000.00 per month in 2005, $12,000.00 per month in 2006 and about $12,000 per month for the first six months of 2007. ANDERSON routinely deposited large amounts of money unrelated to her WMATA payroll into Sun Trust accounts. In the SunTrust accounts alone ANDERSON has deposited over $350,000 into the accounts for the period of December 2003, through October 2007.

Further ANDERSON utilized the Sun Trust account which contained these deposits to make purchases including a parcel of real property in the District of Columbia located at 1838 "M" Street, N.E., a parcel of property in the State of Maryland located at 3505 Olive Branch Drive in Silver Spring, Maryland, and a Nissan Pathfinder automobile and BMW automobiles which were registered and housed in Montgomery County, Maryland. Further ANDERSON paid credit card balances for credit cards which she made personal expenditures such as personal trips and consumer goods such as computers and home furnishings, including three computers from Circuit City on or about April 27, 2007 and April 29, 2007.

In 2006, while the wire fraud scheme was being executed by ANDERSON, she purchased a $37,000 BMW which she paid for by depositing approximately $11,000 (by way of a trade-in allowance) and then paid off the remainder of the loan within one year, including a $1,500 monthly payment and payments totaling $9,960.51 which she made between July 24, 2006 and July 25, 2006 to BMW Credit Corporation.

On or about October 10, 2007, law enforcement officials from the United States government and WMATA executed a search warrant at the residence of ANDERSON. At that time, officials recovered 210 Metro fare cards, $3,484.70 in US currency (with the bills placed in a bundle and coins in a sack), two Western Union Money Orders in the amount of $1,000 each, a bundled pack

of Metrocheks with a piece of paper containing a notation "2029" on it (the approximate amount of funds which had been removed from the WMATA sales office the week before the search warrant had been executed.

As a result of ANDERSON's scheme she caused the loss of $560,722.45 of money belonging to WMATA .

<br>

JEFFREY A. TAYLOR
United States Attorney

By: _____
ANTHONY M. ALEXIS
Assistant United States Attorney
D.C. Bar # 384545
United States Attorneys Office
Federal Major Crimes Section
555 4th Street, N.W.
Washington, D.C.  20530
(202) 514-9416
Anthony.m.alexis@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have discussed it with my attorney, Billy Ponds, Esquire. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 4/14/08

_____
Marcia Anderson
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 4-14-08

_____
Billy Ponds, Esquire
Attorney for Defendant

TOTAL P.13

**DEFENDANT'S ACKNOWLEDGMENT**

I have read this Statement of the Offense and have discussed it with my attorney, Billy Ponds, Esquire. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date:_____    _____
                                Marcia Anderson
                                Defendant

**ATTORNEY'S ACKNOWLEDGMENT**

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: _____    _____
                                Billy Ponds, Esquire
                                Attorney for Defendant